## Case No. 12,328.

### The SANTEE.

[2 Ben. 519.] [1]

District Court, S. D. New York. Oct., 1868. [2]

BILL OF LADING—SPECIAL CLAUSE—DELIVERY OF CARGO—AGENT.

1. Under an ordinary bill of lading, delivery on a wharf of the goods transported by the vessel is sufficient, provided due notice be given to the consignee, and provided the different consignments are properly separated, so as to be open to inspection by their respective owners, and a fair opportunity is afforded to the consignee to remove his goods.

[Cited in Dibble v. Morgan, Case No. 3,881; Unnevehr v. The Hindoo, 1 Fed. 629; The Surrey, 26 Fed. 794; Bonanno v. The Boskenna Bay, 36 Fed. 698.]

2. Under such a bill of lading, the carrier is responsible for the value of the goods, if he deliver them to the wrong person, even though by mistake or imposition.

[Cited in Willis v. The City of Austin, 2 Fed. 415.]

3. Where a bill of lading for cotton contained the following clauses: "It is expressly understood that the articles named in this bill of lading shall be at the risk of the owner, shipper, or consignee thereof, as soon as delivered from the tackles of the steamer at her port of destination. * * * and they shall be received by the consignee thereof package by package, as so delivered, and, if not taken away the same day by him, they may (at the option of the steamer's agent) be sent to store, or permitted to lie where landed, at the expense and risk of the aforesaid owner, shipper, or consignee," held, that such clauses were not unreasonable, and were such as a court should enforce.

[Cited in Willis v. The City of Austin, 2 Fed. 413.]

4. Where 142 bales of cotton were shipped on board a vessel, under bills of lading containing the above special clauses, there being also other cotton on board, and, on the arrival of the vessel, the consignee of the 142 bales paid the

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]
[2] [Affirmed in Case No. 12,330.]

freight on them, and sent carts to remove them before any of them were discharged, and all of the 142 bales were discharged from the vessel on the wharf, but thirteen of them were not received by the consignee, and it did not appear what had become of them, but, after all the other consignees had received all the cotton which they claimed, there remained on the dock thirteen bales without marks, which did not form part of the 142 bales, the cotton having been unladen bale by bale, and the mate of the vessel having tried to separate the various consignments after the bales were landed, and having required receipts to be given for all the cotton that was removed from the wharf before he would allow it to be removed, *held*, that the vessel was not liable for the value of the missing bales.

5. The duty of the vessel, under the bill of lading, was discharged when the cotton was put on the dock.

[Cited in Willis v. The City of Austin, 2 Fed. 413.]

6. Under the bill of lading, the consignees, having had due previous notice, were bound to examine each bale as it left the vessel's tackles, and was deposited on the wharf, and see if it was their cotton.

7. Any custody or control of the cotton on the wharf which the mate assumed to exercise over it was unauthorized, and he had no right to demand a receipt before allowing it to be removed from the wharf.

In admiralty.

E. H. Owen and S. P. Nash, for libellants.

C. Donohue and L. B. Bunnell, for claimant.

BLATCHFORD, District Judge. This libel is filed against the steamer Santee, to recover the sum of $5,000, as the value of thirteen bales of cotton shipped from Mobile to New York by that vessel. The libellants' claim is founded on two bills of lading, one dated January 19, 1866, for seventy-two bales, and the other dated January 24, 1866, for seventy bales. The shipment was by Baker, Robbins & Co.; and each bill of lading specifies that the bales of cotton described in it (and the marks on which are given in the bills of lading) shall be delivered at the port of New York, the dangers of the seas, &c., excepted, to the libellants, Sawyer & Wallace, or their assigns. Each bill of lading also contains, following the foregoing delivery clause, these words: "It is expressly understood that the articles named in this bill of lading shall be at the risk of the owner, shipper, or consignee thereof, as soon as delivered from the tackles of the steamer at her port of destination (the collector of the port being hereby authorized to grant a general order of discharge immediately after the entry of the ship), and they shall be received either at New York or Brooklyn, by the consignee thereof, package by package, as so delivered, and if not taken away the same day by him, they may (at the option of the steamer's agents) be sent to store or permitted to lay where landed at the expense and risk of the aforesaid owner, shipper, or consignee." The one hundred and forty-two bales were properly marked and

numbered when they were shipped, with the same marks and numbers set forth in the bills of lading. The entire cargo was cotton, except that there was one bag of wool. There were, in all, on board, seven hundred and ten bales of cotton, shipped under bills of lading. On the arrival of the steamer at New York, the libellants paid the freight to the agents of the steamer, on the one hundred and forty-two bales of cotton, on the presentation of a bill therefor by such agents, and before any of the cotton was unladen from the vessel. Only one hundred and twenty-nine of the bales specified in the bills of lading came to the possession of the libellants. The whole one hundred and forty-two bales were unladen from the vessel at New York, and placed upon the wharf. After all the parties, except the libellants, who claimed cotton that was on board of the vessel, had removed from the wharf such cotton as they desired to remove, there remained on the wharf thirteen bales of cotton, but none of those bales corresponded, as to mark or number, with any of the bales consigned to the libellants, and it is clear, from the evidence, that no one of those thirteen bales was cotton consigned to the libellants. It is not denied by the claimant that the vessel was bound to deliver, under the bills of lading, the identical bales of cotton that were shipped. The claimant insists, however, that the responsibility of the vessel under the bills of lading was discharged by the unlading of the cotton specified in the bills of lading, from the vessel, and its deposit on the wharf, after notice to the libellants of the arrival of the vessel and of the place where the cotton would be discharged. In regard to this point, not only did the libellants know of the arrival of the vessel, and pay the freight on the cotton, but it is shown that the libellants sent cartmen with carts to the wharf where the vessel was lying, to receive the cotton, before the vessel commenced to discharge the cargo. The libellants claim that the vessel failed to comply with the bills of lading, in not delivering the thirteen bales to the libellants, and in wrongfully delivering them to some other party. No evidence is given to show what became of those thirteen bales. The libellants also claim that the special clause in the bills of lading does not relieve the vessel from liability; that the conditions contained in it are unreasonable and should not be enforced; that if the consignees were required under it to receive the cargo, package by package, then the entire cotton on board should have been assorted on the vessel, and the lot belonging to each consignee should have been delivered by itself and at one time; that as, in this case, no separation was attempted until after the cotton was landed on the wharf, the consignees were thereby absolved from the duty of receiving the cotton package by package; and that, notwithstanding such special clause, the general rule is applicable to

this case, which requires that the different consignments in a cargo, shall, when discharged, be separated by the vessel, so as to render them accessible to their respective consignees. It is shown that in this case the cargo of cotton was unladen, bale by bale, as it came to hand, without reference to what consignment it belonged to; that the mate of the vessel, who had charge of the unlading of her, tried to separate the various consignments of cotton, and among others, the consignment of the libellants, after the bales were landed, and that receipts were required by the mate, and were given, for all the cotton that was removed from the wharf, before it was allowed by him to be removed. It is insisted by the libellants that this course of conduct shows that the vessel claimed, retained, and exercised possession of the cotton after it was landed on the wharf; that, therefore, the mate, acting for the vessel, must have made a wrong delivery of the thirteen bales of cotton; and that the case is thereby taken out of the operation of the special clause in the bill of lading.

The special clause in question is, so far as my observation extends, one recently introduced into bills of lading, and I am not aware that any judicial construction has been given to it. The general law, in the case of an ordinary bill of lading, containing merely the usual clause for delivery to the consignee at the port named, is well established—that delivery on the wharf of the goods transported by the vessel is sufficient, provided due notice be given to the consignee, and provided also the different consignments are properly separated so as to be open to inspection by their respective owners, and a fair opportunity is afforded to the consignee to remove his goods, but that the carrier is responsible for the value of the goods if he delivers them to the wrong person, even though by mistake or imposition. The Eddy, 5 Wall. [72 U. S.] 481, 495; Story, Bailm. § 545b; The Huntress [Case No. 6,914]. Under the ordinary bill of lading the due and proper separation of the goods by the carrier for the use of the consignee is an indispensable prerequisite, in addition to notice to the consignee of the time and place of delivery, to relieve the carrier from responsibility. 3 Kent, Comm. 215; The Eddy, above cited; The Ben Adams [Case No. 1,289]. But, I think the rule is different in regard to a bill of lading containing the special clause in question. That clause seems to have been introduced in view of the law as settled in regard to what is required to constitute a delivery under an ordinary bill of lading. It seems to have been framed expressly to relieve the vessel from the responsibility of separating the different consignments on the wharf after they are unladen. It provides, first, that the cotton shall be at the risk of the consignee as soon as it shall be "delivered from the tackles" of the vessel, at New

York. If the case rested on this clause alone, there might be a question as to the meaning of the word "delivered," and, although the clause does not speak of a delivery to any person, but only of a delivery "from the tackles of the vessel," it might fairly be argued that the word "delivered" is here used in the same sense in which it is used in the earlier portion of the bill of lading, where provision is made for a delivery to the consignees—a sense, the meaning of which is fixed as above explained. But the clause goes on to provide, secondly, that the cotton shall be received either at New York or Brooklyn, by the consignee thereof, "package by package, as so delivered." The words "so delivered," mean, as delivered from the tackles of the vessel; and this branch of the clause shows that the delivery from the tackles of the vessel is, in the view of the parties to the contract, something distinct, as an act, from the receipt of the article by the consignee. This second branch of the clause authorizes the vessel to deliver the cotton from her tackles, package by package, that is, bale by bale, and requires the consignee to receive each bale as and when so delivered. But, even under this clause, it might perhaps be properly contended that the delivery from the tackles intended by it is a delivery to the consignee, and not a delivery to some other person. The third branch, however, of the clause, provides, that if the cotton, after it shall be so delivered from the tackles, shall not be taken away the same day by the consignee, it may, at the option of the agents of the vessel, be "sent to store," or be "permitted to lay where landed" at the expense and risk of the consignee. This provision is not ambiguous, and plainly shows that the parties intended that a landing of the cotton on the wharf, at the place of destination, should be regarded as a delivery of it from the tackles of the vessel. All three branches of the clause must be construed together. When so construed, there is no room for doubt as to what the contract is. As each bale of the cotton is landed on the wharf from the tackles of the vessel, the responsibility of the vessel in regard to it ceases, and the risk of the consignee in regard to it commences. I agree that if the vessel discharges the cotton from her tackles upon the cart of some other person than the consignee, she makes a wrong delivery of it, and her responsibility for it continues. But that is not the present case. As each bale of this cotton left the tackles of the vessel, and was deposited on the wharf, the consignees, having had due previous notice, were bound to examine it and see whether it was or was not their cotton. Any custody or control of the cotton, which the mate of the vessel assumed to exercise after the cotton was landed on the wharf, was in violation of the terms of the bills of lading, and was wholly unauthorized. After it was placed on the wharf from the tackles of the vessel, the mate had no right to require from the

consignees a receipt for it, and they had the right to take it without giving a receipt for it. Under the special clause, the consignees undertook the entire obligation of seeing to the removal of their cotton from the wharf, and the responsibility of the vessel, in regard to the cotton, ceased as soon as it was landed on the wharf from her tackles. The vessel was not bound to separate the libellants' cotton, either on the vessel or on the wharf, from the cotton of other parties, except by landing it, bale by bale, on the wharf. By landing the libellants' cotton on the wharf, the vessel afforded to them all the opportunity to remove the cotton from the wharf which she was bound by her contract to afford, and made all the designation and separation of the cotton which she was bound to make. Such landing on the wharf, after due previous notice, was a delivery to the right person, the freight having been paid, even though the wrong person afterwards obtained possession of the cotton.

It is argued on the part of the claimant, that this interpretation of the bills of lading is inconsistent with the doctrine, that the vessel's lien on the cargo for freight continues after the landing or unlading of the cargo, and that the vessel may, after such landing of the cargo, refuse to deliver it to the consignee till the freight is paid. Certain Logs of Mahogany [Case No. 2,559]. No such question arises in this case, as the freight was paid in advance of the unlading. But I do not perceive the inconsistency suggested. Under the bills of lading in question here, the cotton was at the risk of the consignee as soon as it was landed on the wharf, but, if the freight had not been previously paid, the vessel would have had a right to retain possession of the cotton so on the wharf, and her lien for freight on it would have continued. The consignee could not have claimed that such landing was such a delivery to him as to destroy the vessel's lien on it for the freight, while at the same time, the clauses in the bills of lading in regard to the risk of the consignee would have operated in full force. In the Case of One Hundred and Fifty-One Tons of Coal [Id. 10,520], it was held, that the mere manual delivery of an article by a carrier to the consignee, does not, of itself, operate necessarily to discharge the carrier's lien for the freight, but the delivery must be made with the intent of parting with the lien.

I perceive nothing unreasonable in the conditions of these bills of lading, and nothing that a court should hesitate to maintain. The contract is a plain one, deliberately entered into by intelligent commercial men, and the libellants had it entirely in their power to comply with its terms by stationing a proper person to watch for their cotton as it left the tackles of the vessel for the wharf.

The libel must be dismissed, with costs.

[On appeal to the circuit court, the decree of this court was affirmed. Case No. 12,330.]