## Case No. 12,329.

### The SANTEE.

[6 Blatchf. 1.] [1]

Circuit Court, E. D. New York. Nov. 26, 1867.

#### COLLISION—DEMURRAGE—COMPENSATION.

The fact that the claimant in a suit, in rem, for a collision, by putting repairs on the libellant's vessel, before suit was brought, made her worth more than she was worth before the collision, furnishes no reason for refusing to the libellant a recovery for demurrage, for the time occupied in making such repairs.

[Appeal from the district court of the United States for the Eastern district of New York.]

This was a libel, in rem, filed in the district court, in a case of collision. The claimants had repaired the damage done to the libellant's vessel, but refused to pay any demurrage, for the time occupied in making repairs, and the libel was filed to recover such demurrage. The district court decreed for the libellant [case unreported], and the claimants appealed to this court. The ground taken, on the appeal, was, that no demurrage ought to be recovered, for the reason that, by the repairs, the vessel had been made worth more than she was worth before the collision.

THE COURT held, that the ground taken furnished no reason for reversing the decree below, and that it must be affirmed.

## Case No. 12,330.

### The SANTEE.

[7 Blatchf. 186.] [1]

Circuit Court, S. D. New York. March 19, 1870.[2]

#### BILL OF LADING—FAILURE TO DELIVER—CARRIERS —NOTICE OF DISCHARGE OF CARGO.

1. Where a bill of lading, covering the shipment of bales of cotton by a vessel, contained a clause that such bales should be at the risk of the owner, shipper, or consignee thereof, as soon as delivered from the tackles of the vessel at her port of destination, and that they should be received by the consignee thereof, package by package, as so delivered, and that, if not taken away the same day by him, they might be permitted to lie where landed, at the risk of such owner, shipper, or consignee, the consignee libelled the vessel for the non-delivery of some of the bales. It appeared that the consignee had proper notice of the arrival of the vessel, and of her discharge, and that the proffer of discharge was at a reasonable and proper time, and that the consignee had an opportunity, by reasonable diligence, to identify his cotton and receive it, and it was placed safely on the wharf, when discharged, and was not actually delivered by the agents of the vessel to another party: *Held*, that the vessel was not liable for the loss of the cotton.

[Cited in Willis v. The City of Austin, 2 Fed. 413; The Surrey, 26 Fed. 794; Constable v. National Steamship Co., 14 Sup. Ct. 1068, 1075.]

[Distinguished in Collins v. Burns, 63 N. Y. 5.]

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Affirming Case No. 12,328.]

2. It was the duty of the carrier. notwithstanding such special contract, to give reasonable notice of the arrival and discharge of the vessel, to land the goods at a proper time, and to give to the consignee a fair opportunity to identify his goods, and receive them into his care.

[Cited in The Boskenna Bay, 40 Fed. 93; Constable v. National Steamship Co., 14 Sup. Ct. 1068, 1074, 1075.]

[Appeal from the district court of the United States for the Southern district of New York.]

This was an appeal in admiralty, from a decree of the district court dismissing the libel. [Case No. 12,328.]

Edward H. Owen, for libellants.
Charles Donohue, for claimant.

WOODRUFF, Circuit Judge. The libel in this case is filed for the purpose of charging the steamer Santee with the value of thirteen bales of cotton, part of two certain shipments of cotton, together consisting of one hundred and forty-two bales, from Mobile to New York, which thirteen bales the libellants allege were not delivered as required by the bills of lading. Those bills contain this special clause: "It is expressly understood, that the articles named in this bill of lading shall be at the risk of the owner, shipper, or consignee thereof, as soon as delivered from the tackles of the steamer at her port of destination; and they shall be received either at New York or Brooklyn, by the consignee thereof, package by package, as so delivered; and, if not taken away the same day by him, they may, (at the option of the steamer's agents,) be sent to a store, or permitted to lay where landed, at the expense and risk of the aforesaid owner, shipper, or consignee."

The steamer brought a cargo of 710 bales of cotton for various consignees, all of which were discharged from the vessel on the dock. When the cartmen who were engaged in removing the cotton stopped work, there remained on the dock thirteen bales, which the witnesses for the libellants testified were not part of the 142 bales consigned to the libellants; and the charge is that thirteen bales belonging to the libellants were removed by some other person or persons, and did not come to their possession.

The proof that the libellants did not receive the full number of bales mentioned in their bills of lading was not very precise; but, assuming that they failed to receive their thirteen bales, the question arises—who must bear the loss of the thirteen bales, which must have been stolen after they were placed on the dock, or were, by mistake, carted by other cartmen to other consignees? On this point, the owner of the steamer claims, that, under the special terms of the bills of lading, he had discharged his whole duty, and placed the cotton at the risk of the libellants. Such was the view of the subject taken by the court below, and the libel was dismissed on that ground.

The special clause in the bills of lading is, of course, to be treated as the contract between the parties, and as expressing a condition upon which the carrier assumed the duty to transport at the rate of compensation therein expressed. It was plainly intended to relieve the carrier from any risk or responsibility for the safe keeping of the goods after the delivery thereof from the vessel. It is, however, in respect of the manner of such delivery, to receive a reasonable construction; and no obligation otherwise resting upon the carrier is relaxed, except such as is expressed or reasonably implied in the special clause itself. Thus, the carrier was still bound to give suitable information to the consignees, to enable them to attend and receive the goods, and themselves assume and exercise that care and responsibility of which the carrier was to be relieved. The delivery to be proffered at the ship's tackles must also be at a reasonable and proper time, in order to such attendance by the consignees. Moreover, the act of discharging from the vessel, and the opportunity to receive at the ship's tackles, must be so conducted, that, by reasonable diligence, the consignees or their servants may identify the property, and receive it into their care. But, these conditions having all been complied with, and the agents of the consignees being present to receive the goods, the carrier was not bound to watch the property after it passed beyond the ship's tackles, to see that it was kept safe, or protected from removal, through mistake or design, by third persons. And, once more, the carrier must be held responsible if he or his servants, through negligence, make an actual delivery of the goods to a third person.

It is not claimed, in the present case, that the libellants had not due and sufficient notice of the arrival of the vessel, and of her discharge; or that the time was not, in all respects, reasonable and proper. It is claimed that the libellants used due diligence, but that the discharge of the goods was so conducted that they were unable to receive and take care of the goods when landed; and, also, that the goods were in fact delivered by the servants of the carrier to the wrong person or persons.

The proofs, although they create a strong presumption that the goods were carried away by some person or persons not entitled to receive them, wholly fail to show that there was an actual delivery by the servants of the carrier to such person or persons. On the contrary, the inference is, to my mind, quite clear, that the goods were removed after they had been deposited on the dock, and without any active instrumentality of the carrier's servants. The question of liability becomes narrowed down, therefore, to the enquiry, whether the discharge of the vessel was so conducted that the libellants might, by reasonable diligence, have taken these goods and assumed and exercised due care thereof, and, as a question connected therewith, if not involved therein, whether the libellants did use such diligence. On these questions, it is to be observed, that the express agreement was, that

the consignee should receive the cotton, package by package, as delivered from the tackles of the steamer. The carrier, therefore, was not bound to set a watch over the cotton after it had been removed beyond the reach of the tackles, and was accumulated upon the dock awaiting removal. That duty the shipper or his consignees assumed, when they consented to receive the cotton, package by package, and that it should be at their risk as soon as delivered from the tackles. On the extreme question, what, under such a bill of lading, the carrier should do in a case in which the consignee could not be found, or should not appear at all to receive the goods, it is not necessary to express an opinion. Here, the consignees did appear, paid the freight, and were in attendance for the purpose of receiving the goods.

The first officer of the steamer, who superintended the discharge of the cargo from the vessel, testifies, on the part of the claimant, that he commenced as soon as he received the custom-house permits; that he stood on the wharf and, as fast as the cotton came over, took the marks, and put each lot by itself as fast as he could discern the marks; that all consignments to the various parties were put by themselves, as far as he could discern the marks, comparing the marks with his cargo-book; that there were some six bales on which he could see no marks; that those, also, be kept by themselves until the last of the cotton was delivered, and they were a part of the thirteen bales which remained on the wharf, and were afterwards stored; that the whole cargo of 710 bales was delivered upon the wharf; that the cotton consigned to the libellants was placed on end by itself; and that they were about four days in all in discharging. The testimony on behalf of the libellants shows, that the discharge commenced as early as the 16th of February; but that the cotton of the libellants was not all carted from the wharf until the 22d, and one bale was carted on the 23d. If this testimony is to be believed, the delivery was conducted with due regard to the rights of the libellants. The libellants' witnesses say, however, that, although the delivering officer "tried to sort out the libellants' cotton, he did not do all of it." But it is not shown that the agent of the consignees, if at the ship's tackles, had not an opportunity to identify his cotton, and take proper care of it. On the contrary, the inference is that the agent of the vessel was there to co-operate with and assist therein.

The chief complaint insisted upon is, that the several lots of cotton were not separately stowed on the steamer, and that, therefore, the several bales in any lot were not consecutively delivered; and it is insisted that the consignees were not bound to have a person in attendance to receive the bales, bale by bale, unless they were delivered consecutively. Whatever liability may rest upon the carrier if there be unreasonable delay, from any cause, in making delivery of the goods, I am of opinion that this claim of the libellants cannot be sustained. It is according to the express contract, that the cotton shall be received bale by bale as delivered from the tackles; and this action is not brought for not delivering in due season or with sufficient rapidity, or for detaining the libellants, and subjecting them to too great expense, or consumption of their time.

What, then, was the diligence of the libellants; and did they attend according to the contract, for the identification and receipt of their cotton? Their principal cartman sent there five trucks for cotton of the libellants, and cotton consigned to another house. He himself was not there when the discharge commenced, and, apparently, he was present but once while the discharge of the cotton was in progress. His son received a part of the cotton, and carted it away; but he did not see all of the cotton that was received, and cannot say how many bales he saw taken. Obviously he, being himself engaged in carting to the store, did not attend to the delivery at the ship's tackles. But he says that, when he was absent, Tilden was present. Tilden went to the steamer after she had begun discharging, and says that he thinks he attended that day, the 16th, and every day, to receive cargo, but he cannot say how many bales he "got personally." He says: "I did not watch as it came out, to see whose it was. I paid no attention, nor did any one from Sawyer, Wallace & Co.," the libellants, "as it came out." This, with other circumstances disclosed by the evidence, shows, that the libellants did not assume the care of the cotton as it was delivered from the tackles; that they paid no regard to the obligation to receive it, package by package, as so delivered; and that they were occupied in carting from the accumulating quantity on the wharf, either for themselves or the other house whose cotton they also carted, overlooking entirely the provision in the bills of lading, that, package by package, as delivered from the tackles, the cotton was to be at the risk of the consignees. If the actual discharge of the cargo was, as the mate testifies, completed in four days, exclusive of Sunday, they were occupied two days, at least, after that, in removing the cotton from the wharf. Other cartmen were there, and no doubt, there was some embarrassment in taking the cotton away. But, under the special contract, this did not cast on the steamer the duty of watching the cotton, to see that no one took away cotton to which he was not entitled.

I think the libellants failed to put the steamer in fault, and that the libel was properly dismissed. The decree must, therefore, be affirmed.