THE SURREY.[1]

DIXON *v.* THE SURREY.

*(District Court, S. D. New York.* February 23, 1886.)

1. CARRIAGE OF GOODS BY VESSEL—BILL OF LADING—STIPULATIONS—DELIVERY OF CARGO—NOTICE TO CONSIGNEE—CARE OF GOODS—MARITIME DUTY.

A stipulation in a bill of lading that cargo may be landed "without notice to and at the risk and expense of the consignees of the goods after they leave the deck of the ship" does not relieve the master from the duty of using ordinary and reasonable care for the safety of the goods until reasonable notice of discharge is given, or a delivery made. This duty of ordinary care to save the cargo from loss is a maritime duty, imposed by law upon the master in all situations until delivery is effected. The lack of such care is negligence, from which no stipulation exacted by the carrier can exempt him.

2. SAME—CONSTRUCTION—"CONSIGNEE'S RISK AND EXPENSE."

Construed in connection with the ship's duty under her ordinary agreement to deliver "in like good order and condition," the stipulation means that the goods may be landed at a proper time and place, though without notice to the consignee; and that upon the ship's taking reasonable care of them afterwards, before notice of discharge, they will be at consignee's risk and expense; but if discharged at an improper time or exposed to known and imminent peril of loss, without due notice, the ship will be held liable for breach of duty.

3. SAME—DELIVERY OF FRUIT IN COLD WEATHER—DUTY OF SHIP.

Bills of lading were given at Palermo for 200 cases of lemons, deliverable to order, received on board the steam-ship P., designed to be sent from New York to Canada by rail. The lemons were subsequently transferred at Pa-

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

lermo to the steam-ship S.; but the consignee was not notified of such reshipment, and, expecting the goods at New York by the P., paid no attention to the arrival of the S. The latter waited a few days after her arrival, on account of the coldness of the weather, but finally discharged her fruit, the weather still remaining cold, and the consignees of all the rest of the fruit being on the dock ready to receive and care for their consignments. No one appearing to claim the 200 cases of lemons, they were left on the dock and speedily frozen. *Held*, that a vessel is bound to make a delivery at a suitable time; that a discharge on the dock, without notice, is not a legal delivery, and a discharge at a time when for want of notice the goods cannot be removed by the consignee before they would be destroyed by frost is not a discharge at a suitable time, and not protected by the above stipulation; that the ship was therefore liable for the value of the fruit frozen; and that the S. was further chargeable with negligence in sailing without any copy of the bill of lading, which would have apprised her that the goods were destined for Canada, and that the non-appearance of any consignee was owing to some mistake arising out of the transhipment from the P. to the S.

In Admiralty.

*Hyland & Zabriskie,* for libelants.

*E. B. Convers,* for claimant.

BROWN, J. This libel was filed to recover the value of 200 cases of lemons brought by the steam-ship Surrey from Palermo to New York, and discharged at Harbeck's stores, Brooklyn, on January 26, 1885, and there destroyed by frost. The lemons were shipped at Palermo by the International Line, and a bill of lading given by the agents of that line to the shipper, reciting the receipt of them on board the steam-ship Penyghent, by which vessel they were expected to be forwarded. For some reason the Penyghent was delayed, and the steamer Surrey was chartered by the line to run in her place; and the lemons in question were accordingly laden on board the Surrey. No bill of lading was given by the Surrey. The previous bill of lading, reciting the shipment on the Penyghent, made the goods deliverable to order in New York. That bill of lading was indorsed by the shippers, and forwarded by them to Dixon Bros., Montreal, for whom the goods were shipped, to be forwarded thither by rail from New York. At the top of the bill of lading signed by the agents of the line is a memorandum in red ink, "For transhipment for Canada." Dixon Bros., on receipt of the bill of lading, sent it to their agent in New York to attend to the receipt of the goods from the steamer, and to forward them to Montreal. During the week previous to January 21st, about which time the Penyghent was expected, the agent of Dixon Bros. called several times at the office of Seager Bros., the agents of the steam-ship line in New York, and stated that he expected fruit by the Penyghent, and inquired when her arrival was expected. No information as to the Penyghent could be given, or obtained; but the expected arrival of the Surrey was conspicuously bulletined in the office of the agents. No notice, however, of the transfer of the fruit from the Penyghent to the Surrey was received either by Dixon Bros.; or by Seager Bros., the agents of the line. In

the ordinary course of business the latter should have received notice of the transhipment; and there was evidence at the trial that such notice had been sent to them, but was not received, owing to some irregularities in the mail. There was some evidence, also, though not of a very satisfactory character, that notice of the transfer to the Surrey had been given to the shipper at Palermo. His testimony on this point was not obtained.

Only a small amount of fruit, some 4,500 cases, was brought by the Surrey. After several days of waiting for mild weather, on the morning of the 26th, the consignees of all the fruit except the 200 cases in question, by their representatives at the wharf, determined to accept the delivery of the fruit on that day; and accordingly the whole number, 4,500 cases, were landed upon the dock. The day proved cool. At 11 o'clock A. M. the thermometer was 29 deg. Fahrenheit; at 3 P. M. 25 deg.,—an exposure that such fruit could not bear for more than three or four hours without being destroyed. The number of boxes, however, being small, and the rest of the consignees being prepared to remove their fruit away at once, all the rest was removed without injury. But the libelants and their agent having no knowledge that the fruit had come by the Surrey, or that it was to be discharged, and no one else giving the 200 cases any attention, those cases were frozen and destroyed.

The weather on the 26th was beyond question unsuitable for the discharge of fruit, except upon the actual presence and readiness of the consignees to remove it immediately. A vessel is bound to make a delivery, and a delivery at a suitable time. A discharge upon the wharf, without notice to the consignee, is not a legal delivery; and a discharge at a time when, for want of notice, the goods cannot be removed by the consignee before they would be destroyed by frost, is not a discharge at a suitable time. The vessel in this case is therefore clearly liable, unless she is protected by the stipulations of the bill of lading.

The bill of lading recited the shipment on board the Penyghent, giving "liberty to tranship any part of the cargo by steamer [blank]." Under this blank power of transhipment I shall assume that the goods were lawfully transferred to the Surrey; and that the latter is entitled to all the benefits, and subject to all the obligations, of the bill of lading given for the Penyghent, and that notice of the transfer was given to the shipper at Palermo. The bill of lading provided that the goods should "be delivered from the ship's deck, where the ship's responsibility shall cease, in the like good order and condition, at the port of New York, unto order or assigns." The following stipulations were also added:

" The collector of the port is hereby authorized to grant a general order immediately on entry of the ship at the custom-house, New York. * * * Simultaneously with the ship's being ready to unload the above-mentioned goods, or any part thereof, the consignee of said goods is hereby bound to

be ready to receive the same from the ship's side, either on the wharf or quay at which the ship may lie for discharge, * * * and, in default thereof, the master or agent of the ship, and the collector of above port, are hereby authorized to enter the said goods at the custom-house, and land, warehouse, or place them in lighters, *without notice to and at the risk and expense* of the said consignee of the goods after they leave the deck of the ship; and the owners of the ship are to have a lien on said goods until the payment of all costs and charges so incurred."

The arrival of the ship was entered in the custom house on the 21st. On the same day, at 2:30 P. M., a general order was obtained from the collector for the landing of her cargo, together with a permit for the goods to remain on the wharf 48 hours from that time. The permit last named directed the custom-house inspector, at the expiration of 48 hours, to send the cargo remaining on the wharf, not permitted, to the proper general order store. The time covered by this permit had expired nearly three days before this fruit was landed. There is no evidence whether the permit was renewed or not.

It is a pervading rule of the maritime law that the master of a vessel intrusted as carrier with the custody of the property of a distant owner is bound to exercise reasonable care of the goods until delivery pursuant to the contract. This duty of reasonable care for the preservation of the property from loss arises in all situations and in all emergencies. Machl. Shipp. 428–430, 437, 443; *Cargo ex Argos*, L. R. 5 P. C. 135; *The Spartan*, 25 Fed. Rep. 44, 56. It is in accordance with this general obligation that, in the absence of any special stipulations in the bill of lading, if a cargo be duly landed, on notice to the consignee at the port of destination, and the consignee fails to appear, or refuses to take the goods, the master cannot abandon them, but is responsible for reasonable care of the goods, and must either hold them as bailee, or store them on the shipper's account. *Richardson* v. *Goddard*, 23 How. 39; *The Grafton*, 1 Blatchf. 173, 175; *Redmond* v. *Liverpool, etc.*, 46 N.Y. 578; *McAndrew* v. *Whitlock*, 52 N. Y. 40, 46; *The City of Lincoln*, 25 Fed. Rep. 839, and cases there cited. Where the stipulations of the bill of lading require the consignee to be present and receive the goods as soon as the vessel is ready to unload, and that they shall be at the consignee's risk as soon as landed on the dock, and the consignee is duly notified, and attends in order to accept the goods as landed, and takes more or less charge of them, the stipulation is held to exempt the ship from subsequent loss or damage. *The Santee*, 2 Ben. 519; S. C. 7 Blatchf. 186; *The City of Austin*, 2 Fed. Rep. 412; *The Kate*, 12 Fed. Rep. 881. In such cases, as the consignee has due notice of discharge, and accepts the goods, the duty of protecting the property is cast by the contract upon him, and the ship is relieved. In the case of *The Santee*, 7 Blatchf. 186, 189, WOODRUFF, J., says: "On the extreme question, what, under such a bill of lading, the carrier should do in a case in which the consignee could not be found, or should not appear at all to receive

the goods, it is not necessary to express an opinion." That is the precise question presented in this case. It is answered, in my judgment, by the general rule of the maritime law above cited.

As respects all such stipulations inserted by the carrier for his exemption from liability, the ordinary rule is that they are to be strictly construed. They are not to be extended by implication beyond the fair import or necessary meaning of their terms. Still less do they exempt from negligence, or from the duty of ordinary care imposed by law upon the carrier, unless that be expressly stated, or unless the stipulations can otherwise have no effect at all. Thus, a general provision that goods shall be carried at the "owner's risk" does not excuse the carrier from the duty of ordinary care. *New Jersey St. Nav. Co.* v. *Merchants' Bank*, 6 How. 344; *Bank of Kentucky* v. *Adams Exp. Co.*, 93 U. S. 174, 181; *Mynard* v. *Syracuse, etc.*, 71 N. Y. 180; *Canfield* v. *Baltimore & O. R. Co.*, 93 N. Y. 532; *Holsapple* v. *Rome, etc.*, 86 N. Y. 275. Under the decisions of the supreme court in *Railroad Co.* v. *Lockwood*, 17 Wall. 357, and *Express Co.* v. *Caldwell*, 21 Wall. 264, and *Bank of Kentucky* v. *Adams, etc.*, 93 U. S. 174, 181–184, it is well settled in the federal courts that all stipulations, indirect as well as direct, inserted by the carrier for exemption from loss by his own negligence, are void. *The Hadji*, 20 Fed. Rep. 875.

From either of the above points of view, I am of opinion that the stipulations of the present bill of lading do not exempt the Surrey from responsibility for the loss of the goods under the circumstances of this case. The very terms of the bill of lading, although authorizing the ship to land the goods when she was ready to unload, without notice to the consignee, and at his risk, do not purport to relieve the ship from her previous agreement to deliver the goods "in like good order and condition;" nor to absolve her from her general maritime duty to take reasonable care of the goods in all situations; nor to authorize a delivery at an improper time; nor voluntarily to expose the goods to obvious peril of destruction. None of these exemptions can therefore be attached to this stipulation by implication. It is limited by legal construction, as the clause providing for carriage at the "owner's risk" is limited in the cases above cited. The agreement to deliver "in like good order and condition" is incompatible with the broad exemption claimed by the ship under the special clause. Construed strictly, and so as to harmonize with the ship's duty to make a good delivery, the stipulation means that the goods may be, indeed, landed at a proper time and place, though without notice to the consignee; and that, upon the ship's taking reasonable care of them afterwards, they will be at the consignee's risk and expense; but if discharged at an improper time, or voluntarily exposed to known and imminent peril of loss, the ship will be held liable for her breach of duty. *The Aline*, 25 Fed. Rep. 562. Again, as the duty to take reasonable care of the goods until proper notice of discharge is given, or a delivery is completed, is not affected by this

stipulation, the failure to take such reasonable care of the goods in the mean time is negligence, from responsibility for which no stipulation exacted by the carrier can exempt him. *Bank of Kentucky* v. *Adams, supra.*

I adhere, therefore, to the views heretofore expressed in the cases of *The Boskenna Bay*, 22 Fed. Rep. 662; *The Egypt*, 25 Fed. Rep. 324, 327, 328; and *The City of Lincoln*, 25 Fed. Rep. 835, 839. Such stipulations as these, though they expressly authorize the landing of the goods on the dock without notice, do not dispense, until reasonable notice of discharge, or a legal delivery, with the use of ordinary and reasonable care for the safety of the goods. Considering the great amount of goods that come consigned to order; the frequent impossibility that consignees should either know or be prepared to take immediate care of such goods as soon as landed; and that it may often happen that there is no one present, except the ship's company, that can possibly give any care to goods thus landed,—an express stipulation that all goods might be landed instantly, without notice and without regard to circumstances, and that the ship should not be required to take any further care of them whatever, when mere ordinary attention would preserve them from destruction, should be held to be an unreasonable and unconscionable exaction by the carrier, and void as against public policy. *Express Co.* v. *Caldwell*, 21 Wall. 264–266. In the management of the steam-ship lines that require stipulations like those in the present case, reasonable care of the goods landed is intended to be afforded, and is usually afforded, by various means, such as covered piers, locked gates, watchmen, and appliances for extinguishing fire. The actual intent is to give reasonable protection. The carriers seek to make this protection voluntary, in order to avoid legal liability in case of loss. But if the loss is by the ship's clear fault, that is negligence, and the stipulation does not avail her. All the just requirements and conveniences of shipping lines, having reference to the necessities of regularity, economy, and dispatch on their part, (*The Egypt*, 25 Fed. Rep. 320, 327,) will be protected under such stipulations as the present, although these stipulations are so limited by construction that the ship shall still be held legally bound to take such reasonable and ordinary care of the goods as may save them from destruction, and which no one but the ship is at the time in a situation to give.

In the case of *The Egypt* it was held, upon the facts, that there was no negligence or want of reasonable care, and the ship was therefore held not liable. In the present case, the facts show the contrary. The weather, as above stated, was so cold that it was not a proper time for the discharge, unless the consignees were present, and prepared to take the fruit away immediately. The consignees of these 200 cases were not present, and had no knowledge that the goods were on the Surrey. To discharge the fruit at such a time, without previously ascertaining whether the consignees were present and prepared

to remove it or not, was voluntarily exposing it to evident peril, which was itself an act of negligence.

The evidence shows, however, that the defense now set up is in the nature of an after-thought, and was not the ground of the ship's conduct at the time. The ship had in fact waited several days for favorable weather. When these goods were landed they were supposed to be represented by the consignees present. The marks upon these 200 cases were the initials of a prominent fruit dealer in New York, who, it was supposed, had arranged to remove them. But this was at best mere supposition. The Surrey had taken no copy of the bill of lading, and no bill of lading for these cases was presented to the ship before the discharge. In sailing without the ordinary maritime document for these goods, she was evidently in fault; and that fault contributed to her misapprehension in this case. Had she had a copy of the bill of lading, it would have been perceived that the goods were to be "transhipped for Canada;" and when the 200 cases were found remaining on the wharf in a cold day, after all the others had been removed, that circumstance would have indicated the probability that the consignee of these goods, which were intended for Canada and were deliverable to order, had had no notice of their arrival, and that the ship must therefore take care of them to prevent their speedy destruction.

It is urged that inasmuch as the custom-house inspectors, after the expiration of the 48-hour permit, were authorized to remove the goods at once to the general order store, and inasmuch as sections 2966 and 2969 of the Revised Statutes required the collector to take possession of merchandise discharged under general order, and to deposit the same in bonded warehouse, and that such goods "shall be kept with due and reasonable care, at the charge and risk of the owner," the goods in this case, from the moment they were landed, must be deemed in the possession of the inspector and under his care, and the vessel held exempt. If it had appeared that the inspector had taken the actual custody and control of these goods, a different case might be presented. But there is no evidence to that effect. The provisions cited from the Revised Statutes are designed for the benefit of the government, and not to exempt the ship from any responsibility. The Egypt, 25 Fed. Rep. 320, 333. Had any attempt on the part of the ship to take care of these goods been thwarted by the inspector's interference, the vessel might possibly have been excused. It is evident that the inspector exercised no charge or control over them, and they were frozen because the ship gave them no attention. So far as appears, there was nothing that prevented the ship from doing any suitable acts for the protection of the goods, either by taking them back into her hold, or by making suitable provision for them on the wharf, or by requesting the inspector to forward them at once to the warehouse, which upon request he would doubtless have done.

The ship's inattention to the fruit, it is pretty evident, arose less from design than from accident, through the common misunderstanding growing out of the transfer of the cases from the Penyghent to the Surrey. Under these circumstances, the question is on whom, under the contract, the loss must legally fall. For the reasons above stated I must hold the vessel responsible, as was done in the cases of *The Aline,* 19 Fed. Rep. 875; S. C. 25 Fed. Rep. 562; and the *The Boskenna Bay,* 22 Fed. Rep. 662.

A decree may be entered for the libelants, with costs.