Choate, D. J.
This is a libel in rem to recover damages for the failure of the steamship to deliver a case of merchandise conformably to the bill of lading issued for the same. The answer is that the case was delivered according to the terms *413 of the hill of lading. The bill of lading contained the following clause: “It is expressly understood that the articles named in this bill of lading shall be at the risk of the owner, shipper or consignee thereof, as soon as delivered from the tackles of the steamer at her port of destination; and if not taken away the same day by him they may, at the option of the steamer’s agents, be sent to store, permitted to lay where landed, or return to the port of shipment at the expense and risk of the aforesaid owner, shipper or consignee.” The steamer carried upon the same voyage over 1,000 cases and packages for a firm called L. & H. Blum, and some 700 for the libellants. Both the libellants and L. & H. Blum were merchants doing business at Galveston, Texas, and the voyage was from New York to Galveston.
It is claimed on the part of the steamer that, under the bill of lading, the ship is not liable for the loss of the goods if it happened after they were landed on the wharf at Galveston; that the consignees, these libellants, had notice of the time and place at which the ship was to discharge her cargo, and actually attended at the wharf by their agents during the discharge before this particular case was put out on the wharf; that they, therefore, had due notice of the landing. In the case of The Santee, 2 Ben. 595, 7 Bl. 186, a construction was given to a bill of lading similar to this, except that in that case the bill of lading also provided that the goods should be received by the consignee “package by package, as so delivered,” i. e.f “from the tackles of the steamer.” It was held that under such a bill of lading the ship’s liabliity ceased when the goods were put on the wharf from the the tackles of the ship, and that the fact that the mate afterwards attempted a separation of the goods of the several consignees, and took receipts for them, did not affect the question.
I do not think there is any material distinction between the two cases. The words held, in the case of the Santee most distinctly to show the purpose of the parties to limit the liability of the ship to the time when the goods were placed on the wharf from the tackles of the ship, was that clause which provides that if the goods, after being so deliv *414 •red from the tackles, should not be taken away the same lay, they might, at the option of the agents of the vessel, be “sent to store” or “permitted to lay where landed,” at the expense and risk of the consignee. As to that, Judge Blatchford says, (2 Ben. 525:) “This provision is not ambiguous, and plainly shows that the parties intended that a landing of the cotton on the wharf, at the place of destination, should be regarded as a delivery of it from the tackles of the vessel.” This remark applies with full force to the present case.
It is, however, insisted that there is no proof that the case in question was landed on the wharf before it was taken away. There is evidence showing that the eartmen employed by L. & H. Blum, and eartmen employed by the libellants, went to the wharf and took and carried away cases and packages of goods, and that Blum received one package more than his bills of lading called for, 'and the libellants one less than theirs called for. There is also evidence tending to show that thi3 particular package was misdirected, having upon it the name of “L. & EL Blum,” instead of “P. J. Willis & Co.,” as stated in the bill of lading. It is shown that some time after the discharge of the cargo the goods contained in this-ease were found in Blum’s store, where, after they were so discovered, they were destroyed by fire. It also was shown that the delivery clerk of the steamer at Galveston' was present during the discharge of the cargo, and the carting away of the goods, and that he took note of the number of packages taken away by the eartmen of each consignee, as they were taken away. This witness testifies that “the freight was discharged from the vessel by stevedores; that the draymen selected the freight as it lay on the wharf.”
This, it seems to me, is sufficient proof that the case in question had been already delivered upon the wharf before it was taken, as, upon the proofs, it appears that it was taken by Blum’s drayman. The subsequent acts of the delivery clerk, which in his testimony he described as a delivery of the goods to the drayman — that is, the checking off of the number of the cart, name of drayman, etc. — are in no way different in character or effect from what was done by the- *415 mate in the case'of the Santee. It is observed, in that case, that an actual delivery from the tackles of the ship upon the cart of the wrong person would make the ship liable. 2. Ben. 525; 7 Bl. 188. The evidence does not show any such direct delivery to Blum as that. On the contrary, the proof is that the goods were landed on the wharf, and afterwards taken away by Blum’s draymen. I think, therefore, the caséis governed by the case of the Santee, and that the ship is not responsible, because the goods in question were delivered, within the meaning of the bill of lading, and the consignees had full notice to attend, and did, in fact, attend, upon the discharge of the vessel to receive their goods. Libel dismissed, with costs.