**NORJAC TRADING CORPORATION,**
**Libellant,**

v.

**THE MATHILDA THORDEN, her engines, boilers, machinery, etc. and all persons having any interest therein, and Gust. B. Thorden, trading as Thorden Lines, her owner, Respondents.**

**No. 5 of 1956.**

United States District Court
E. D. Pennsylvania.
May 12, 1959.

24

Rawle & Henderson, Harrison G. Kildare, Philadelphia, Pa., for libelant.

Krusen, Evans & Shaw, Springer H. Moore, Jr., Philadelphia, Pa., for respondents.

KRAFT, District Judge.

This is an action in admiralty to recover damages for the loss by spoilage of a shipment of horse-radish roots, allegedly caused by respondents' negligence.

The action was tried to the Court without a jury. Counsel have submitted requests for findings of fact, conclusions of law and supporting briefs. From the evidence, we make the following

### Findings of Fact

1. Libellant, Norjac Trading Corporation, is now, and at all material times was, a corporation having its principal office and place of business at No. 101 South 39th Street, Philadelphia, Pennsylvania.

2. Respondent, Motorship Mathilda Thorden, was at all material times a cargo vessel engaged in transportation of merchandise in foreign trade, and at all times hereinafter mentioned was owned, operated and controlled by Gust. B. Thorden, trading as Thorden Lines.

3. Respondent, Gust. B. Thorden, was at all material times engaged in the business of operating merchant vessels in foreign trade, under the name and style of Thorden Lines, having a principal office and place of business at Uddevalla, Sweden.

4. Libellant, at all times material to this action, was the consignee and owner of a shipment of 80 bags of horse-radish roots, transported on board the Motorship Mathilda Thorden, owned and operated by respondent, Thorden Lines, from Gothenberg, Sweden, to Philadelphia, Pennsylvania, under the terms and conditions of a bill of lading issued by the carrier at Gothenberg on October 25, 1954.

5. The horse-radish roots were received by the carrier in good order and condition, and, as expressly provided in the bill of lading, were stowed in the "reefer space" or refrigerated compartment of the ship, where cool, even temperature conditions could be safely maintained to prevent spoilage of the roots.

6. The Mathilda Thorden proceeded from Gothenberg to New York, arriving there on November 7, 1954. On the following day, respondents' agents advised the master that, owing to a current dock strike at Philadelphia, the vessel would be required to proceed directly to Baltimore, unless the dock strike should be settled in time to permit the scheduled call at Philadelphia.

7. The bill of lading contained a provision that in the event strike conditions made delivery of cargo at the designated port unsafe, the carrier was authorized to make delivery at the nearest safe port. There was no strike in progress at Baltimore.

8. The Mathilda Thorden sailed from New York on November 9th, and, in the absence of contrary instructions from her agents, by-passed Philadelphia and reached Baltimore on Wednesday, November 10, 1954.

9. Some time before noon on November 10, 1954, respondents' Philadelphia agent telephoned to libellant's Philadelphia agent, Morris Friedman, Inc., advising that the shipment of horse-radish roots would be discharged that afternoon in Baltimore.

10. Morris Friedman, Inc., thereupon, by special delivery letter, requested R. G. Hobelmann Co., in Baltimore, to act as libellant's agent, to take all necessary steps to receive the shipment and to arrange to have the goods transported to Philadelphia. Friedman forwarded to Hobelmann the documents that the consignee was required to produce in order to arrange for customs entry and delivery.

11. Hobelmann received the shipping documents on the morning of November 11, 1954, and proceeded to prepare the usual consumption entry and release order forms, and delivered the necessary papers to the carrier's agent, R. C. Herd and Company, that morning.

12. Diversion of Philadelphia cargoes to Baltimore, because of the dock strike at Philadelphia, created substantial congestion in handling the paper-work connected with inbound cargoes, and resulted in delays with respect to obtaining entry through customs during the emergency.

13. The customs entry papers for libellant's shipment were delivered by messenger to the carrier's agent on the morning of Thursday, November 11. The carrier's agent notified Hobelmann on Friday, November 12, that the entry form and release order had been executed. Hobelmann then picked up the completed papers and delivered them to the customs authorities for processing and payment of import duties. These details were not completed by the customs authorities until Monday, November 15, at which time Hobelmann requested Victor Lynn Lines, Inc., a motor carrier, to send a refrigerated truck to

pick up the goods on the pier and deliver them to Philadelphia, as instructed by Morris Friedman, Inc. Libellant's shipment was picked up by the trucker on Tuesday, November 16, 1954.

14. From about 3:30 p. m. on Wednesday, November 10, until the shipment was picked up by the trucker on Tuesday, November 16, the horse-radish roots had been located on the covered pier of the Western Maryland Railroad where they had been discharged from the Mathilda Thorden. Throughout this period they had been exposed to temperatures varying each day and night as much as 34 degrees, with daytime highs up to 70 degrees Fahrenheit.

15. Although refrigerated railroad cars were available at the pier throughout this period, and would have been furnished for temporary storage of the shipment upon the request of the carrier's agent, the agent made no attempt to obtain the use of these facilities.

16. Libellant's trucker brought the eighty bags of horse-radish roots to the Merchant's Industrial Warehouse in Philadelphia, where they were transferred from the refrigerated truck to a properly refrigerated compartment.

17. Upon arrival in the Philadelphia warehouse, the horse-radish roots were inspected by a representative of the libellant and by representatives of two firms which had previously contracted to purchase them. Twenty bags had been committed to one purchaser, and sixty bags to the other. Examination of various bags throughout the shipment disclosed that the roots were moist, soft, rubbery, and showed unmistakable indications of spoilage in respect to their stale odor and the presence of brown and black rings.

18. Horse-radish roots will spoil unless they are kept at a fairly even temperature of about 45 degrees Fahrenheit.

19. The spoilage of libellant's horse-radish roots was caused by their exposure to variations of temperature on the pier in Baltimore during the period from November 10 to November 15, 1954.

20. Under the circumstances which then existed the respondents should have foreseen the likelihood of spoilage of libellant's horse-radish roots.

21. Under the circumstances which then existed the libellant-consignee had no reasonable opportunity to remove its horse-radish roots from the pier until sometime after 10:00 a. m. on November 15th.

22. Both purchasers rejected the horse-radish roots because of the deterioration which made the roots unmarketable. Libellant kept them under refrigeration for twelve months thereafter in the belief that they might harden sufficiently to meet market requirements and minimize the loss. When this was not accomplished at the end of one year, the entire shipment was destroyed. At that time, the maximum period allowed by law for recovering the duty paid had expired.

23. Libellant's loss involved the following items: $2,745 for the purchase of the roots, $225.20 paid for duty and entry costs, $1,399.80 loss of profit from the cancelled sales, and $150 expense for storage at Philadelphia for six months after delivery, amounting to total damages of $4,520.

### Discussion

Most of the foregoing facts do not appear to be seriously in dispute. The prime issue presented is whether the carrier in any way breached a legal duty owing to the libellant.

It is libellant's contention, among others, that the carrier was negligent in not giving earlier notice of the intended diversion of the vessel to Baltimore, to expedite the processing of libellant's goods by its Baltimore customs agents. We think, in the circumstances of the case, that this contention is without merit. It is true that the carrier knew as early as November 8 that a strike was in progress at Philadelphia, but it

very reasonably took into account the fact that the strike might end at any time. Asked why he waited until the forenoon of November 10th to call Friedman's office, Bernard Krones, traffic manager for the carrier's Philadelphia agent, testified: "Well, the reason is that in these strikes you never know when they are over and you always hope until the last minute that you can put the ship in, and that is why you wait until the very last minute to say, now, we can't wait any longer, the vessel has to go, the vessel has to discharge. We are very sorry to have to put it in at Baltimore. And for that reason we wait until the very last minute because there is always a chance in these strike conditions that it may be over any minute".

It was for this reason that the vessel left New York with instructions to proceed directly to Baltimore, unless it should receive word meanwhile that the strike had been settled at Philadelphia, in which event it should put in at that port. Obviously, as the event transpired, the vessel's ultimate destination could not certainly be known until some hours after it had left New York, i. e., until it had reached in its course the geographical point of departure for either Baltimore or Philadelphia. Since the vessel left New York on November 9, it is difficult to perceive how notice could have been given before the morning of November 10.

Libellant's main contention seems to be that the carrier was negligent in that it merely discharged the shipment upon the pier in Baltimore, exposing it to unfavorable weather conditions, when it could have placed the goods in a refrigerated railroad car or truck, both of which were readily available. Here, we think, libellant is on more substantial ground.

The bill of lading contains the following provision: "The Carrier or his Agent shall not be liable for loss or damage to the goods during the period before loading and after discharge from the vessel, howsoever such loss or damage arises". We think this provision is ineffective in view of the language of the Harter Act, § 1, 46 U.S.C.A. § 190. See North American Smelting Co. v. Moller S.S. Co., 3 Cir., 1953, 204 F.2d 384.

In Tan Hi v. United States, D.C.N.D. Cal.1950, 94 F.Supp. 432, the Court pointed out that the Harter Act was designed to re-determine the relations between shipper and carrier and to prohibit contracts restricting the carrier's common-law obligations, one of which was to make a good or proper delivery. The Court went on to say (at page 434):

"The duty imposed by the common-law upon water carriers was merely to transport from port to port, or from wharf to wharf. The carrier was not bound to deliver at the warehouse of the consignee; it was the duty of the consignee to receive the goods at the wharf. But the carrier was duty bound to notify the consignee of the vessel's arrival and the time of discharge. The carrier was also obliged to discharge its cargo at a fit wharf, to separate each consignment so as to afford the consignee ready access for inspection and removal, *and to protect the cargo until the consignee had a reasonable opportunity to remove it from the wharf*. If the consignee failed to remove his goods within a reasonable time, the carrier could relieve itself from further responsibility only by depositing the goods in a warehouse for the account of the consignee (citing numerous authorities).

"But these were the elements of a 'proper' delivery only when the custom, regulations, or law of the port did not otherwise provide. As the Supreme Court stated in Constable v. National Steamship Company, 1894, 154 U.S. 51, at page 63, 14 S.Ct. 1062, 1067, 38 L.Ed. 903, 'No rule is better settled than that the delivery must be according to the custom and usage of the port,

and such delivery will discharge the carrier of his responsibility.' The common-law did not permit less nor require more in the way of delivery than the usage or law of the port dictated". (Emphasis supplied.)

Both libellant and respondent introduced testimony in an effort to prove a custom in the Port of Baltimore with respect to the delivery of refrigerated cargo and the obligation to protect it after its discharge from the carrier. This testimony was most contradictory and unsatisfactory, and failed to persuade us of the existence in the Port of Baltimore of any generally recognized custom or usage in such regard.

We conclude that the question comes down to one of due care—or the want thereof—on the part of the carrier. In North American Smelting Co. v. Moller S.S. Co., supra, the question presented was whether the carrier exercised due care in leaving unguarded part of a shipment of scrap metal after its discharge onto the pier. The Court said (204 F. 2d 384, 386):

"There is no doubt that in discharging the cargo onto the pier and notifying the consignee the carrier was no longer in possession of the goods so as to suffer the risk of loss not due to any negligence on its part * * *.

"We think the real and only issue in this case gets down to the question whether the appellee exercised reasonable care in placing the goods on the pier, notifying the consignee and then, after a portion of the goods had been removed, leaving them without a guard until they were finally taken away in a truck furnished by the consignee."

While the Court ruled that the carrier was free of negligence, it is implicit in the Court's reasoning that the carrier was under the duty to protect the cargo until the consignee had a reasonable opportunity to remove it from the wharf.

Speaking of negligence, the Court stated: "The general test is, of course, the conduct of a reasonable man under the circumstances, and in that test the value of the interest to be protected and the risk of harm are elements to be considered". It has also been said that the test of negligence is whether the wrongdoer could have anticipated and foreseen the likelihood of harm to the injured person, resulting from his act. Dahlstrom v. Shrum, 1951, 368 Pa. 423, 425, 84 A.2d 289. Applying these tests to the circumstances in this case, we think the only reasonable inference is that respondent was negligent in failing to place libellant's goods in a refrigerated space after discharging them from the vessel. Respondent knew, of course, that the goods were "reefer" cargo and was aware of the congestion in the Port of Baltimore owing to the diversion of cargo from Philadelphia. The consequent delay in effecting clearance through customs was either known to or foreseeable by respondent. It was readily foreseeable, in these circumstances, that shipments might remain on the pier for days, exposed to normal temperature variations, with resulting deterioration in the case of perishable goods. We are persuaded that respondents' failure to provide against these contingencies constituted negligence.

Libellant's testimony on the question of damages was uncontradicted. One item of the damages claimed was the sum of $300, representing the charges for storing the goods in Philadelphia for a year in an effort to "harden" the roots sufficiently to meet market requirements. We are persuaded that twelve months was an unreasonable period and that six months was an ample period for this purpose, and the damages claimed are reduced pro tanto.

### Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter.

2. Respondent was not negligent in giving libellant notice of the intended diversion of libellant's cargo from the Port of Philadelphia to the Port of Baltimore.

3. Respondent was negligent in failing to place libellant's cargo under refrigeration after discharging it onto the pier in the Port of Baltimore.

4. Libellant is entitled to judgment against respondent in the sum of $4,520, with interest thereon from November 15, 1954, and the costs of this proceeding.