**F. J. WALKER, LIMITED, Et Al., Plaintiffs,**

**Orleans International, Inc., Et Al., Plaintiffs-Appellees,**

v.

**The MOTOR VESSEL "LEMONCORE," her engines, etc., Et Al., Defendants-Appellants.**

**No. 75–2066.**

United States Court of Appeals, Fifth Circuit.

Oct. 27, 1977.

Rehearing Denied Nov. 28, 1977.

Paul D. Hardy, Tampa, Fla., for defendants-appellants.

David G. Hanlon, Tampa, Fla., for Orleans, Int. & York Int.

Brooks P. Hoyt, Tampa, Fla., for Gulf Fla. Terminal.

Before GODBOLD and CLARK, Circuit Judges, and HOFFMAN *, District Judge.

* Senior District Judge of the Eastern District of Virginia, sitting by designation.

**CHARLES CLARK, Circuit Judge:**

This action is founded upon admiralty and diversity jurisdiction. Part of a shipment of frozen meat thawed and spoiled during unloading and delivery. The consignees sued to recover their damages from the carrier of the cargo, the stevedore which unloaded the ship, and the warehouseman who received part of the shipment. The carrier denied liability but sought indemnity from the stevedore. We affirm the district court's holding that the Harter Act, 46 U.S.C.A. §§ 190 *et seq.*, renders the carrier liable to the consignees for the damages to the cargo, but we remand for further fact finding on the indemnity issue.

F. J. Walker, Ltd., an Australian exporter, consigned 61,942 cartons of meat during late-July or early-August 1971 to the Motor Vessel LEMONCORE, at Sydney, Australia, for delivery to Tampa, Florida. The plaintiff, Orleans International, Inc., the consignee of the greatest portion of the shipment, is an importer and a Detroit, Michigan distributor of food. Other consignees who joined Orleans as plaintiffs are York International Exchange Corporation and Pierce Trading Company Sales Corporation. Defendant Maritime Fruit Carriers, Ltd., owned the Motor Vessel LEMONCORE and defendant Refrigerated Express Lines (A/Asia) Proprietary, Ltd., operated the vessel under charter. Both are collectively referred to as the carrier. Defendant Gulf Florida Terminal (stevedore) was employed by the carrier to perform the off-loading, stevedoring, and limited cold storage services at Tampa. Defendant Seaboard Cold Storage, Inc., (warehouseman) also performed cold storage services at Tampa in connection with receiving the shipment of frozen meat, acting on behalf of consignees.

The LEMONCORE arrived at the port of Tampa on Thursday, September 9, 1971. Rain prohibited discharge of the cargo that day and the next. Discharge began Saturday, September 11, and a controversy

promptly arose between the carrier and the warehouseman when Seaboard demanded overtime payment for this Saturday work. As a part of the settlement of this wage dispute, the warehouseman agreed to accept and store all meat discharged until 2:00 p. m. on Saturday. Any subsequent discharge was to be placed in the stevedore's warehouse. It was understood that the meat stored at the stevedore's warehouse would be removed on Monday, September 13, and taken to the warehouseman's dock for delivery to the consignees.

The carrier instructed the stevedore to use five work gangs to discharge the LEMONCORE on Monday. Pursuant to its Saturday agreement, at 8:00 a. m., on Monday, the stevedore removed the approximately 4,000 cartons of frozen meat that had been placed in its warehouse and transferred them to the unrefrigerated terminal dock area for delivery. The five gangs then began the process of removing the remaining cartons of meat from the LEMONCORE. Another problem arose when the warehouseman and the stevedore got into a dispute over the use of certain pallets. The warehouseman wanted the meat loaded into trucks to be palletized on the pallets regularly used by the stevedore. The stevedore was unwilling to perform this service because over 1,000 of these pallets had not been returned. It was only willing to load the trucks using larger pallets which would not permit dense loading. When both parties remained adamant, the trucks had to be bed-loaded without the use of pallets thereby requiring more than one hour per truck, as compared to 20 minutes by the pallet process. As the day wore on a large quantity of frozen meat accumulated on the unrefrigerated delivery dock of the warehouseman. The district court found this was due to "a shortage of terminal personnel, a high rate of discharge by the stevedoring personnel from the M/V LEMONCORE and/or a large number of mixed bills of lading." The latter problem resulted from cartons meant for different consignees being mixed in stowage on the ship. After discharge, the cartons then had to be segregated into proper grouping.

The accumulation of meat on the open dock first became serious at approximately noon on Monday. The deposition of Earl Martin Tushman, a vice president of Orleans International who was in charge of this importation, stated that the carrier was contacted initially at no later than 2:00 p. m. on September 13 and that other contacts followed. He also testified that the carrier was told that the meat was accumulating on the dock and could not be refrigerated. Despite these notices, the carrier refused to discontinue unloading the cargo.

Tushman's first contact was with Jim Murray, the New York-based manager for the carrier in the LEMONCORE operation. After being told that "we were going to run into a large problem," Murray responded, "We must finish this boat." Murray reputedly also stated that he had to empty the boat since a longshoreman's strike was imminent and that he "could not care less what happened to the meat ashore." Others in the carrier's management were contacted and each refused to stop the discharge. The carrier disputes that these contacts were made as early as 2:00 p. m., instead alleging that no notice of the difficulty in keeping the discharged cargo properly refrigerated was given until 6:00 p. m. or later. The stevedore requested the carrier to permit it to halt the discharge of the boat at approximately 7:30 p.m. on September 13. According to the carrier, there were approximately 12,550 cartons of the total shipment of 60,000 cartons still remaining on the ship at this time.

The testimony of several of the individuals made it clear that even after Jim Murray, the carrier's New York supervisor, knew of the conditions then existing and worsening, Murray insisted that discharge of the vessel continue. Frequent discussions began to take place on the Tampa dock between representatives of the stevedore, the warehouseman, and Captain John Brewster, an independent surveyor of cargo employed by the carrier after the thawing of the meat became apparent. Suggestions made to prevent the impending loss included reloading some of the meat on the vessel and

attempting to procure other cold storage locations for the meat. Despite several earlier and virtually unanimous recommendations to stop discharge, Captain Brewster testified that all parties agreed at approximately 11:00 p. m. that continued discharge was appropriate, especially considering that the warehouseman had offered to provide cold storage in its 22 refrigerated trailers that had been standing by to receive the shipment. This testimony is not corroborated. The warehouseman informed the consignees of the serious damage that was occurring and requested releases from the consignees before it would agree to accept the shipment. Although these releases were given, at 9:00 a. m. on Tuesday, the warehouseman acting on behalf of the several consignees refused to accept the meat.

The temperatures on these mid-September days in Tampa reached 90° Fahrenheit. It was agreed that to maintain proper condition of the meat, the temperature must remain below 20° Fahrenheit. By the evening of September 13, there had accumulated in unrefrigerated storage areas approximately 30,000 cartons of frozen meat. Though the shipment was completely removed from the LEMONCORE by 2:30 a. m. Tuesday, September 14, the final cartons of meat were not placed in cold storage until 5:00 p. m. on that day. All the cartons were then refrozen. Captain Brewster and a representative of the insurance carrier determined that the meat was substantially damaged: "all cartons totally defrosted, is in very bad shape, cartons badly bloodstained, degree of external sourness, and greenish fats." Their opinion was that only a total reconditioning of the meat would prevent the need to re-export this shipment. The total number of cartons which were affected was approximately 14 to 15 thousand.

On November 12, 1971, the stevedore delivered the thawed and then refrozen cartons to the warehouseman for Orleans International's use. Orleans International rejected 10,810 of these cartons. These 10,810 cartons were offered at public auction on December 13. The highest bid was 31 cents per pound; and Orleans International accepted the meat rather than a sale at that price. The district court found that this 31 cents per pound was the market value of the thawed meat on September 14 at Tampa, Florida. Orleans took this meat to its Detroit distributing operation where it was reconditioned. It then sold the meat by including two or three of the reconditioned cartons in a larger order of meat. It was hoped that the purchasers might overlook or agree to accept this damaged product. Considerable difficulty was encountered, and the meat was frequently rejected. Apparently on some occasions after rejection, the meat would be offered and accepted at a lower price. Despite these problems, in time all of the reconditioned meat was sold.

York International also received damaged meat. A surveyor after inspecting this shipment determined that it had depreciated fifty percent in value. The district court ordered the carrier to compensate York for this fifty per cent depreciation. Using a reasonable market price for sound meat of 61 cents per pound, the damages awarded York nearly duplicated the per pound damages granted Orleans based on the salvage auction price of 31 cents.

## IMPROPER DELIVERY

Under general principles of maritime law, a carrier is obligated to "unload the cargo onto a dock, segregate it by bill of lading and count, put it in a place of rest on the pier so that it is accessible to the consignee, and afford the consignee a reasonable opportunity to come and get it." *American President Lines, Ltd. v. Federal Maritime Board*, 115 U.S.App.D.C. 187, 188, 317 F.2d 887, 888 (1962). This obligation requires the placement of the cargo on a "fit wharf" and giving the consignee reasonable notice of the arrival of the cargo. *Calcot, Ltd. v. Isbrandtsen Co., Inc.*, 318 F.2d 669, 673 (1st Cir. 1963); *J. Kinderman & Sons v. Nippon Yusen Kaisha Lines*, 322 F.Supp. 939, 941 (E.D.Pa.1971); *see also North American Smelting Co. v. Moller S.S. Co.*, 204 F.2d 384 (3d Cir. 1953). If the Harter Act, 46 U.S.C. §§ 190 *et seq.*, is applicable, no provisions of

any contract between a carrier and the owner of goods can relieve the carrier from liability for "loss or damage arising from negligence, fault or failure in . . . proper delivery of any and all lawful merchandise or property" committed to its charge. Therefore, it is necessary that a carrier exercise reasonable care to protect cargo entrusted to it during the discharge operations. *Thompson v. Calmar Steamship Corp.,* 331 F.2d 657, 661 (3d Cir.), *cert. denied,* 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184 (1964). Mere delivery to a wharf is insufficient. The wharf must be "fit" as described in *Kinderman, supra.* Since the cargo had been unloaded from the ship, the Harter Act is the only statutory proviso which could apply. *See generally,* G. Gilmore & C. Black, The Law of Admiralty § 3–25 (2d Ed. 1975).[1] However, after a proper delivery has been made, the provisions of the Harter Act no longer apply. *Isthmian Steamship Co. v. California Spray-Chemical Corp.,* 300 F.2d 41, 43 (9th Cir. 1962); *Kinderman, supra.*

Here no issue is raised as to the good condition of the meat prior to its discharge from the vessel. As previously noted, the district court found that the accumulation of frozen meat in the unrefrigerated section of the dock and its consequent thawing was by "reason of a shortage of terminal personnel, a high rate of discharge by the stevedoring personnel from the M/V LEMONCORE, and/or a large number of mixed bills of lading.[2]" Considering these factors, the court concluded that the LEMONCORE "failed to make proper delivery within the meaning of [the Harter Act] in that [the] perishable cargo of frozen meat product was discharged by the carrier to an unfit wharf." The court also held that the discharge occurred under circumstances "that would obviously result in damage" and that the carrier failed to protect the cargo after it was discharged and before it was delivered.

The defendant carrier first contends that the district court erred in finding it had not made proper delivery under the Harter Act. The Harter Act was enacted to prevent enforcement of provisions in contracts between carriers and the shipper or owner of goods that absolved the carrier from liability for its negligence. The overweening advantage of carriers vis-a-vis shippers led to exculpatory clauses in carriage contracts that Congress found to be unacceptable. G. Gilmore & C. Black, The Law of Admiralty §§ 3–24 *et seq.* (2d Ed. 1975); *Caterpillar Overseas, S. A. v. S. S. Expeditor,* 318 F.2d 720, 723 (2d Cir.), *cert. denied,* 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963). Since once delivery occurs the Harter Act has no continuing effect on the propriety of exculpatory clauses, the carrier has inserted in its form contract here the provision that it will bear no responsibility for loss, even if caused by its own negligence, subsequent to the discharge of the goods from the vessel.

It is the vessel's position that a proper delivery occurred when the meat was discharged from the ship because the disclaimer in its bill of lading operates to exclude liability for the subsequent heat damage. Alternatively, it contends that any difficulties ashore were created by the warehouseman, who was the shipper's agent, and therefore, the provisions of § 192 apply that absolve the vessel from liability when the injury occurs from "any act or omission of the shipper or owner of the goods, his agent or representative . . . .."

The concept of "proper delivery" requires "that the cargo be placed upon a fit wharf at the port of destination," and not merely that discharge from the vessel occur. *Levatino Co. v. American President Lines, Ltd.,* 337 F.2d 729 (2d Cir. 1964); *cf. Caterpillar Overseas, S. A. v. S. S. Expeditor, supra* at

---

1. Another statutory scheme which might be applicable in cases involving cargo damage is the Carriage of Goods at Sea Act (COGSA), 46 U.S.C. §§ 1300–1315. It does not cover damage ashore. 46 U.S.C. § 1311.

2. To give the carrier the benefit of the doubt, we assume for purposes of our decision that the district court concluded that part of the shortage of terminal personnel was due to the warehouseman's insistence on loading of its trucks without the use of pallets, thereby forcing the use of a much slower procedure.

724. The concept of "fit wharf" in *Levatino* was applied in the context of delivery of chestnuts that could not withstand temperatures below 28° Fahrenheit. Despite the danger to the cargo of these low temperatures, the vessel discharged its load of chestnuts in temperature which dipped below 20° Fahrenheit. Some attempt was made to protect the cargo from the elements, but these efforts were patently inadequate:

> ■ An ordinarily safe wharf is not "fit" for deliveries or storage if it is being inundated by extraordinarily cold air, any more than if it is being flooded by waves of water. Here the weather was cold enough to create a serious hazard of freezing. At the very least, President Lines should have taken minimal steps to protect the chestnuts.

337 F.2d at 730. Even though a clause in the bill of lading disclaimed responsibility by the vessel for providing any special heating facilities at the pier, this did not relieve the vessel from liability since it had not made a proper delivery under the Harter Act. In *British West Indies Produce, Inc. v. S. S. Atlantic Clipper*, 353 F.Supp. 548 (S.D.N.Y. 1973), the consignee of two shipments of yams, ginger, and pumpkins attempted to recover from the vessel and time charterer for the loss to this cargo due to exposure to freezing temperatures. The cargo was unloaded into an unheated shed unprotected from the elements. The vessel "was under a duty to place the discharged portion upon a fit pier in order to effect a proper delivery." *Id.* at 552. In part, the vessel attempted to avoid liability by contending that the immediate discharge of the cargo was necessary to avoid an impending longshoremen's strike. A similar argument is raised here. This is not a proper justification. "A threatened or impending strike, or labor negotiation, with the usual problems, afford no excuse for a carrier not taking reasonable and proper steps to comply with its duty of safekeeping the cargo." *Id.* at 553. *See also Norjac Trading Corporation v. The Mathilda Thorden*, 173 F.Supp. 23 (E.D.Pa. 1959).

■ To determine whether a "proper delivery" to a "fit and customary wharf" has occurred, "[n]o rule is better settled than that the delivery must be according to the custom and usage of the port." *Constable v. National S. S. Co.*, 154 U.S. 51, 63, 14 S.Ct. 1062, 1067, 38 L.Ed. 903 (1894), *quoted* in *Norjac Trading Corp. v. The Mathilda Thorden, supra*, 173 F.Supp. at 27; *Tan Hi v. United States*, 94 F.Supp. 432, 436 (N.D. Cal.1950); *see also Calderon v. Atlas S. S. Co.*, 170 U.S. 272, 276, 18 S.Ct. 588, 590, 42 L.Ed. 1033 (1898). The *Tan Hi* court applied these Supreme Court precedents in deciding that under the Harter Act proper delivery occurred when made consistently with the customs of the port, unless such a delivery under the peculiar circumstances of the case subjected the cargo to a greater than normal risk for cargo in that particular port.

■ In the present case, testimony was uncontroverted that bedloading of trucks by hand as opposed to loading with the use of machinery and pallets, was not an uncommon occurrence at this port. Thus, since the stevedore and the warehouseman properly could expect that the LEMONCORE would slow its own discharge to compensate for the greater amount of time necessary to handload each truck, the conflict in the use of pallets in the loading of trucks does not absolve the LEMONCORE from responsibility. Whatever the merits of each side's position in the pallet dispute, the resulting slow-down did not constitute an "act or omission" that absolves the LEMONCORE under 46 U.S.C. § 192.

Moving to considerations broader than the pallet dispute, the proof was clear that stevedores at Tampa frequently requested that they be permitted to slow or cease discharging cargo to permit delayed aspects of the discharge operation to become current. Thus, the carrier's refusal to permit this temporary cessation violated the customs of the port. Nonetheless, the LEMONCORE avers that under the bill of lading it had a right, supported by judicial precedent, to demand continuous discharge of its cargo. The bill of lading expressly

provides that the carrier is at liberty to discharge the cargo as quickly as it can. The customs of the port are not to govern. It also provides, however, that if the consignee does not accept delivery at the rate the ship elects to use, liquidated damages may be assessed for each day or partial day of delay incurred. The bill of lading further provides that as an alternative to assessing liquidated damages the ship may continue the discharge at its maximum rate.

In *Hellenic Lines, Ltd. v. Embassy of Pakistan*, 467 F.2d 1150, 1154 (2d Cir. 1972), the court held that the consignee was liable for the delay in discharge of cargo despite congestion in the port and the absence of modern equipment, problems that were not attributable to the consignee. However, that court made an important distinction, one which totally undercuts the applicability of *Hellenic* to the carrier's argument here. The shipper argued that under COGSA it could not be held responsible for delays in discharging the ship because the delay was in no wise its fault.[3] Such an argument was held to misconstrue the scope of COGSA, as that Act does not relate to claims for delays in discharging goods. Instead, COGSA applies to physical "loss or damage" to the goods themselves. "Detention is wholly unconnected with physical loss or damage to goods" and is outside the ambit of COGSA. *Hellenic, supra* at 1156. While *Hellenic* specifically excluded the applicability of COGSA (and by analogy the Harter Act)[4] to the delay issues there discussed, the Harter Act precisely covers the central controversy here, physical damage to goods.

 Neither *Hellenic* nor the other cited cases allow a continuous discharge clause to permit a carrier to be indifferent to conditions ashore. If discharge is made despite evident harmful consequences to the cargo, the provisions of the Harter Act operate to make the carrier liable for such damages despite bill of lading disclaimers or rights. Though a carrier may have a claim for detention when a consignee fails to take continuous delivery of the cargo, the consignee cannot be made to bear the loss of physical damage to the goods just because it was unable to take the cargo "as fast as vessel can deliver."

*The St. Georg*, 104 F. 898 (4th Cir. 1900) involved a cargo damage claim in which the bill of lading contained a similar provision for continuous discharge "as fast as the steamer can." After due notice to the consignee, the carrier began discharging its cargo of bags of rice at 7:30 a. m. but soon outpaced the ability of the consignee to accept delivery. The weather forecast for the day included a prediction of heavy showers; however, the first indication of the possibility of rain in the dock area was observed at 11:00 a. m. The downpour was so severe the rice got wet despite the fact that it was covered with tarpaulins. There are a number of similarities between *St. Georg* and the instant action. The consignee had adequate notice of when the rice would be discharged and how much was involved yet it had only procured two drays for the removal of the rice and these were inadequate. The carrier here similarly urges that the consignee inadequately prepared for the removal of the meat as it could have procured sufficient pallets of the proper size for loading the trucks at the greatest dispatch. In *St. Georg* warehouse shelter space had been offered the consignee in case of rain but this was not utilized. There is testimony in the present case that the warehouseman first offered and then withdrew the use of refrigerated trailers for storage of the meat. Though the consignee's suit for damages was dismissed by

---

**3.** Under COGSA, 46 U.S.C. §§ 1301 *et seq.,* The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault, or negligence of the shipper, his agents, or his servants.
46 U.S.C. § 1304(3). *See* note 1 *supra.*

**4.** For purposes of judging liability before loading and after unloading the vessel, COGSA and the Harter Act "come down to much the same thing." *British West Indies Produce, Inc. v. S/S Atlantic Clipper*, 353 F.Supp. 548, 551 n.6 (S.D.N.Y.1973), *quoting* G. Gilmore & C. Black, The Law of Admiralty 127 (1957).

the Fourth Circuit, its reasoning is instructive because it points us to the distinction between that case and this:

> If the consignee, who knew his resources for removing the goods, believed they were being landed so rapidly as to delay him in their removal and in taking proper care of them, it was manifestly his duty to inform the master of that fact, in order that the goods might be discharged in a manner not to embarrass the consignee in their removal.

*Id.* at 902. No such notice was given to the carrier in *St. Georg*; the carrier had no knowledge of the difficulties being experienced by the consignee. While rain was forecast, it only appeared after several hours of clear skies. Consequently, there was not the obvious danger there to the cargo that the Florida heat presented here. The *St. Georg* court noted "[h]ad the master persisted, after objection by the consignee, in landing the goods in such a way as to likely result in their damage, the ship might have been held liable therefor." It was the failure to object to the discharge pace which was fatal to the consignee's claim.

■ In sum, the carrier had no right to damage the cargo in an attempt to keep the consignee to his contractual agreement to accept the shipment continuously and at as fast a pace as the vessel can manage. As in *Hellenic* and as the bill of lading specified here the right to sue for damages caused by the delay is the carrier's remedy. We agree with the reasoning of *Calcot, Ltd. v. Isbrandsten Co.*, 318 F.2d 669, 673 (1st Cir. 1963), that "rules and customs concerning storage charges have no relevance to the question of what constitutes a proper delivery of the cargo." To the extent the carrier's contract here seeks to go beyond the establishment of liquidated damage storage charges, it is invalid.

■■ A stevedore assumes by contract the carrier's obligation to discharge the cargo. *Stein Hall & Co., Inc. v. S. S. Concordia Viking*, 494 F.2d 287 (2d Cir. 1974). A breach of these responsibilities obligates the carrier to compensate the injured party. In relation to the consignees' rights, knowledge by the stevedore of the accumulation of meat operates as notice to the carrier of the condition. Thus, once the stevedore knew it was unable to remove the meat and place it into proper cold storage, the carrier knew there was no longer a fit wharf. The LEMONCORE and its stevedore could not continue to put the meat out on the dock, oblivious to the problems that were preventing timely reloading of the perishable cargo into appropriate cold storage. Under the Harter Act the delivery ceased to be proper and the carrier is consequently liable to the consignees for damages.

## DAMAGES

■ The carrier also attacks the trial court's basis for determination of damages which used the difference between the fair market value at the port of destination of the goods in sound condition and their value after being thawed, rather than calculating an amount of actual loss from the proof. *See Emmco Insurance Co. v. Wallenius Caribbean Line, S. A.*, 492 F.2d 508, 514 (5th Cir. 1974).

Using the price bid at a reasonably conducted salvage sale to indicate the market value of the damaged goods may be appropriate. *Cummins Sales & Service, Inc. v. London & Overseas Insurance Co.*, 476 F.2d 498, 502 (5th Cir. 1973), *cert. denied*, 414 U.S. 1003, 94 S.Ct. 359, 38 L.Ed.2d 239 (1973). However, the Supreme Court has pointed out "[t]he test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable." *Illinois Central Railroad Co. v. Crail*, 281 U.S. 57, 64–65, 50 S.Ct. 180, 181, 74 L.Ed. 699 (1930). The carrier argues that use of the bid price to measure damages here would permit these consignees to recover more than their actual loss.

"The primary object in awarding damages is to indemnify plaintiff for the loss sustained by reason of the carrier's fault." *Interstate Steel Corp. v. S. S. Crystal Gem*,

317 F.Supp. 112, 121 (S.D.N.Y.1970), *quoted with approval* in *Dixie Plywood Co. v. S.S. Federal Lakes*, 404 F.Supp. 461, 465 (S.D. Ga.), *aff'd*, 525 F.2d 691 (5th Cir. 1975). The carrier points out that consignees' proof disclosed that most of the damaged meat was in fact sold by them at prices far above the amount fixed by the court as the after damage value.

One consignee, Orleans International, decided to keep the meat rather than sell it at the highest bid made in the salvage sale conducted in December 1971. Substantial reconditioning and shipping expenses were described. The exact quantity of meat discarded is not evident, but testimony indicated that some cartons, 300 in one lot, were completely unusable. Though the consignee attempted to include this reconditioned meat with top quality product in filling its orders in Detroit, it met substantial difficulty in doing so. This forced some reductions in the price of the meat in order to persuade purchasers to accept it. Even when the meat was finally accepted, the repeated return and then redistribution to other customers caused additional handling and shipping costs to be incurred. This evidence completely removes the present fact situation from that considered in the principal case relied upon by the carrier, *Weirton Steel Co. v. Isbrandtsen-Moller Co.*, 126 F.2d 593 (2d Cir. 1942). In *Weirton* the carrier had allowed the plaintiff-shipper's cargo of steel plate to be damaged by liquified resin. The consignee accepted the shipment and, after reconditioning, was able to use the damaged plate to make five-gallon steel cans as originally intended. The proof did not show that any reduction in market price was necessitated by the imperfections in the plate. Noting that recovery of damages is meant to indemnify the injured party, the plaintiff was allowed to recover only the cost of reconditioning the metal plates rather than a theoretical before and after value difference.

We do not differ with *Weirton*. Its holding is simply inapposite to the facts proven here. The consignees clearly established that substantial costs were incurred in reconditioning and marketing the thawed meat. Some quantity of the product rotted and was totally worthless and was discarded. Still other boxes that could be reconditioned were shown to have been sold at half the standard market price. The amounts and costs involved can not be deduced with any reliability.

It appears that the district court was faced with establishing damages by one of two methods, both of which were inexact. This was not due to consignees' failure to meet their burden to produce the best proof available. The carrier is in no position to complain that the damaged parties can not establish precisely the loss it caused. *Daniels Towing Service, Inc. v. Nat Harrison Associates, Inc.*, 432 F.2d 103 (5th Cir. 1970). In such a situation the court should use the best indication it can obtain rather than deny any recovery. Here the court had available before and after values which indicated what the open market estimated the loss to be. It also had indications that the actual experience in salvage may have enabled consignees to reduce this estimate, though the consignees urge that the same figures show they did not do as well when all related costs are considered. In such a situation the district court has a discretion to choose the method it considers best. *See Illinois Central Railroad Co. v. Crail, supra; Santiago v. Sea-Land Service, Inc.*, 366 F.Supp. 1309, 1314–1315 (D. Puerto Rico 1973). We cannot say that discretion was abused here.

### INDEMNITY

Under the precedents interpreting the Harter Act, delivery to an unfit wharf normally forces the carrier to bear the loss. This case, however, does not present the standard unfit wharf situation in which a carrier blithely ignores weather conditions from which no protection has been provided on the dock.[5] Cold storage was available.

---

5. For example, in *Levatino Co. v. American President Lines, Ltd.*, *supra*, the vessel discharged chestnuts onto a dock where no heating facilities had been erected. Even though the bill of lading specifically denied any responsibility by the carrier for furnishing protection

When the carrier commenced unloading no party appears to have foreseen the problems which would develop. Nevertheless they did develop and when the cargo began to accumulate in the heat, no matter who was at fault, the wharf became "unfit." If the stevedore's negligence made the dock unfit or the discharge improper, it must indemnify the carrier. The district court required the carrier to bear the full loss of the damage to this cargo. Because there are not sufficient findings of fact to permit a proper review of this issue, we remand with directions to make such findings.

A stevedore owes a warranty of workmanlike performance to the vessel. *Ryan Stevedoring Co., Inc. v. Pan-Atlantic S. S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); *Stein Hall & Co., Inc. v. S. S. Concordia Viking, supra.* In fulfilling this warranty, the stevedore owes the vessel a duty to use such care and diligence as an ordinarily prudent and skillful person would use in the same circumstance. *New Orleans Stevedoring Co. v. North Atlantic & Gulf S. S. Co.*, 213 F.2d 859 (5th Cir. 1954). There can be no doubt that the stevedore, in order to fulfill the requirements of his warranty, must at least inform the vessel of a serious hazard being created ashore due to the rapid discharge of cargo and thereby permit a decision as to whether operations should be slowed or temporarily terminated. *See Old Dominion Stevedoring Corp. v. Polskie Linie Oceaniczne*, 386 F.2d 193 (4th Cir. 1967); *Villain & Fassio E. Compagnia v. Atlantic & Gulf Stevedores, Inc.*, 283 F.Supp. 725 (E.D.Va.1968). However, proof of a breach of the warranty of workmanlike performance does not ipso facto establish a right to indemnity by the vessel. Obviously, if such breach is not an operative factor in the damages that occur, or if conduct on the part of the shipowner causes the injury, *Weyerhaeuser Steamship Co. v. Nacirema Operating Co.*, 355 U.S. 563, 567, 78 S.Ct. 438, 441, 2 L.Ed.2d 491 (1958), indemnity should be denied.

According to testimony by the carrier itself, at the time the stevedore informed it of the dangerous accumulation of meat in unrefrigerated areas on the dock, only 12,550 cartons of meat remained in the ship. If it is assumed from the uncontradicted yet somewhat unclear testimony that a serious concentration of meat was definitely apparent at noon, the stevedore must have continued rapid discharge for seven and one-half hours before giving notice to the carrier of the condition. If this condition existed it would constitute a breach of the warranty of workmanlike performance.

Other testimony indicates that the consignee Orleans International, through its agent, the warehouseman, contacted the carrier's New York City agent and informed him of the difficulties being experienced on the dock. Requests to have the unloading halted were allegedly rejected. Besides calls to Murray, the warehouseman contacted at least two other employees of the carrier but did not succeed in having discharge stopped. The estimated times when such contacts began varied from noon to 6:00 p. m. If the court should find that the carrier received and rejected timely notice of trouble, it could conclude that the stevedore's failure to notify the carrier in timely fashion played no part in the carrier's failure to stop the unloading. If these earlier notices to the carrier were insufficient either in time or content, or if the stevedore's failure to warn of danger is shown to have caused the carrier to disregard the information given by others, then the breach of the stevedore's warranty of workmanlike performance could be the operative factor in the damage that occurred on the Tampa dock. In such event, indemnity would be proper. Our indication of the possible factors to be weighed is not intended to exclude others or to intimate any view as to the ultimate outcome of this issue.

We affirm the district court's determination as to carrier's liability and damages

from the cold once the goods were ashore, this was denied effect since until the cargo was unloaded on a pier in which heat was available,

no proper delivery under the Harter Act had occurred.

and remand for further findings as to stevedore's liability.

AFFIRMED IN PART AND, IN PART, REMANDED.